Good morning. Good morning, Your Honor. Aaron Rock for Petitioner Fergus. May I ask for two and a half minutes for rebuttal? Certainly. Keep your eye on the clock, please. Ms. Fergus, the job applicant, seeks reversal of summary judgment, remand for further proceedings, and asks the court to entertain reassignment. In oral argument, I'd like to summarize the case, say a word about diversity, a word about reassignment, and then spend the balance answering your questions and discussing the facts in a presentation different from the written briefs. A summary of the case, the job candidate with the best qualifications, both the minimum and the preferred, according to the employer's own written standards, scored higher and won the majority of the votes of the hiring committee, but then the chair of never happened before or since. Was the principal, Ms. Evans, the ultimate decision-maker? That's the way it was structured, right? She makes the final call? Ms. Evans testified as such, yes. And other than Mr. Conley's experience, is there anything in the record indicating that she had to follow the majority vote, so to speak? I submit, so the the record is clear that a hiring committee is required. The record is clear that the procedures require a rating. Everyone in the committee is required to rate each candidate. Where the record, Ms. Evans testified that she's not obligated to follow that procedure, which is fine, but on summary judgment in the light... She didn't assign a rating, did she? She left her scores blank. So, Ms. Evans, who by the way did screening interviews before the interview committee, left her scores blank. When asked why, she said, sometimes I do, sometimes I don't. No other explanation. So, on this record, it has never happened before or since that the majority of the hiring committee, that was a 3-2 vote, decided. Well, it was known that two of the five members of the committee had previously written letters of recommendations, so they had some familiarity with your client. Ordinarily, if you were going to put that much authority in the hands of a committee, would you expect to include two members of the committee who weren't coming at fresh? What I'm not saying is, I'm not saying that the process they used was improper. I'm saying it seems to me that this was a step they went, but I'm not sure that you can put that much emphasis on what this committee itself may have decided or tallying scores of all the individual members, given that it wasn't a fresh slate for everybody. Well, Your Honor, I think that's a reasonable inference that a jury can make at trial, but in the light most favorable to the non-moving party, Ms. Evans, who hand-selected the committee, Ms. Evans, who had the applicants' material before she decides who sits on the committee, would have had access to that information. And I think the... But I think, too, I think the same point that Judge Clifton is pointing out. Nothing binds her to the votes of the committee. The committee's formed. They assist her in interviewing. They score. She didn't even score. It came to 27.5 for the winning candidate, and as your client, 30. A minuscule difference between the two. So there's lots of factors to take into account when you decide who is a better fit for particular position. She has the ultimate authority. She made it. What evidence in the record suggests that her proffered explanation is a pretext? So with regard to pretext, when Ms. Evans was asked what the decision was founded on, her answer, and I'm looking at excerpts of the record 161, the question was, why didn't you hire her, meaning Ms. Fergus? Answer, because Ms. Azeem had the ability to teach multiple subjects. The position was temporary, LAP funded. My decision was to go to the candidate with a greater ability to teach different subjects. Later, that same page, and did you ask Ms. Fergus in her interview if she could teach more subjects? If it was not in the interview question form, it was not asked. And by the way, Ms. Evans was responsible for writing which questions were asked in the interview form. Question, so you made a decision without knowing if she could teach more than one subject. Answer, I made the decision based on the information I had. Later, same page, the tipping point in hiring Ms. Azeem was her ability to teach multiple subjects. So, the decision-maker tells you what her reasons were. Now, the district court and the defense have a lot of other reasons they want to talk about. The decision-maker, in this case, told you what her reasons were, and her reason... She said two reasons. One, she felt that the winning candidate was a better fit, and two, because of her engineering degree, she had the ability to teach multiple subjects. Now, give me your best pretext argument. She can't tell you what better fit means, and in other cases, courts have decided that better fit is the kind of vague answer that could be pretext. And with respect to the teaching multiple subjects, that decision violates the collective bargaining agreement. So, it would be a violation of law for her to use that as the basis. Well, I'm not sure I agree with your premise, but even if we have a statute that enforces the collective bargaining agreement, you have to draw from that an inference that the real reason was something different. And, frankly, somebody in her position, faced with uncertain funding, having somebody with this engineering degree which says to her, this is a person capable of teaching more, strikes me as entirely logical. That there may be a problem with the union down the road doesn't tell me that it's not a logical reason. So, in other words, if there's reason is unlawful, that is evidence of pretext. Well, how can you get unlawful out of it? The most you can get is in violation of the collective bargaining agreement. That's not unlawful. The collective bargaining agreement isn't written into the statutes. So, it may be a violation of the collective bargaining agreement, which I'll use instead of unlawful, but still doesn't tell me it's not a logical reason. It's not the reason that she might actually have relied upon. The Court can consider, if I'm willing to breach a collective bargaining contract in order to get this applicant, that this is pretext. And then, when you combine it with the other evidence, I believe we have what we need to establish pretext. The District Court, where I think things went sideways at the District Court level, was that the plaintiff in the District Court level was put in the position of trying to establish, using circumstantial evidence, what was in the minds of the decision maker. And here's what we're up against. This is Ms. Hirschman, who opened the committee meeting by saying, what we need is more diversity. And when you say, in education, you look for... What does that mean? She tells us... Diversity could mean a lot of different things. Well, Ms. Hirschman tells us what she meant. When you say, in education, you look for a workforce that reflects population and diversity, do you mean in demographic terms like male, female, race, and national origin? Answer, yes. Later, Ms. Hirschman, we want our students to see people like them teach in those positions. When she was asked about getting people from different backgrounds, answer, I don't know any other diversity other than what I can see. When I asked her, well, if someone's wearing a cross or a religious headdress, does that give you any information? I would see those two features, yes. And so, would that be diversity in the context of religion? Right? Answer, no. This is what we're up against. People wear... This is her answer. People wear jewelry that may or may not be a part of what their religion is. People wear clothes that may or may not be part of what their religion is. Question. So, someone could wear a cross that has... Gives you no information as to whether or not that person is or holds them out to be a Christian? You're taking it a little bit out of context, because while Ms. Hirschman did say that, when you asked her, so that would be diversity. This is follow-up on the question about religious headdress and wearing a cross. You asked, is it Ms. Hirschman or Mr. Hirschman? Ms. Hirschman. You asked her, and so that would be diversity on in the context of religion. Right. She said, no. And you said, it would not be. She said, no. Can you explain your answer? She said, people wear jewelry that may or may not be part of what their religion is. People wear clothes that may or may not be part of what their religion is. And you said, so someone could wear a cross, and that gives you no information as to whether or not the person is, holds themselves out to be a Christian? Answer, that would be an assumption that I would not make. So what do you make of that testimony? How does that help you, given those answers? Your Honor, our position is, it's just not credible. If someone wears a religious headscarf, a yarmulke, a cross around their neck. How do we know this is a religious headdress? Did somebody say that in the record? Yes. Who says that? A declaration of Mark Connolly. And there's also. What was that assumption based on? There is also. He asked the winning candidate whether that was a religious headdress that she was wearing. No questions. Where does he get that other than his own assumption? Our position is that religious items like a cross around the neck, a yarmulke, a religious headscarf is something within the lay person's ordinary ability to see. If we need to call in an expert to say that it's a headdress. Well, I think that would be a decent approach if what we were required to do was to prove that she was actually a Muslim. Following the Abercrombie and Fitch case, we're not trying to prove that the winning candidate was Muslim. What we're trying to prove is that the employer, the decision maker, regarded her as such. Who regarded her as Muslim? Other than what Mr. Connolly said, based on his own assumption that's not supported by the factual record. Which decision maker made that assumption? So. If the employer can simply deny race or religious discrimination by denying that they know whether someone is of a particular race or a particular religion. Well, now you're giving employers a secret path, not a secret path, a clear path. All you need to do to avoid discrimination is to deny that you recognize someone has a someone has a religious. Because you can't recognize based on that. It's an assumption that is unwarranted unless there's a fact to base it up, back it up in some way. Right. So Mr. Connolly's declaration says it. It is in the record. It was not stricken. It's in the record. Ms. Z, the candidate's photo is also in the record so the court can see what it looked like. And we had to take that extraordinary measure because the decision makers were unwilling to admit to such a basic fact. I'm not asking you to to find that she was or was not a Muslim. I'm asking you to find that she wore a distinctive headdress that there's no other clear logical explanation for. And on summary judgment, I think that's the argument. I just don't think it's warranted on this record. Do you want to save the rest of your time? Thank you, Your Honor. Good morning, Judge Fernandez, Judge Clifton, Judge Nguyen. May it please the Court, Keith Kemper on behalf of the K-12 entities. Co-counsel and I, Mr. Baker, will be splitting our time this morning. And Mr. Baker has generously conceded 10 minutes of our 15 minutes to me. So I'll do my best to cover a copious record within the 10 minutes that I have. Welcome to Seattle. For the record, Judge Clifton, it was not I who chose Seattle over Honolulu for today's hearing. And if we have a chance to do this again, I'd ask that we get to come to your home. Seattle looks pretty nice today. Today it does. We're here for a good week. In the course of preparing for this argument, I, like you, re-read Judge Rice's order a number of times. And no offense to you fine jurists assembled here in Seattle as opposed to Honolulu, but the judge from Spokane wrote a heck of a good decision. I suppose it's cliche for the lawyer on the winning side to look at the decision in our favor and say, well, he's a good judge. But being as objective as I can, I remain impressed with the way that he covered the entire record, had commanded the case law, and addressed all the issues that were raised by all the parties. And he appeared, I submit, to grant to the plaintiff all the reasonable inferences that are appropriate under summary judgment, at the same time declining to follow her where she overstated the record or went off track. I was tempted to just read his ruling into the record today, but I think I owe my client a bit more than that. There's also an old cliche that says, if you don't have the law, argue the facts. If you don't have the facts, argue the law. If you don't have either, pound the podium. I plan to discuss a few of the facts because the facts support dismissal. I plan to argue the law because the law supports dismissal, and I will leave the podium pounding to others. Well, the district court found that the plaintiff did show a prima facie case, at least with regard to race discrimination, so then we have to get to the next step of McDonnell-Douglas and ultimately the question of pretext. Now, counsel for plaintiff in the briefing as well as today makes much of the fact that these interview questions were preset, and they did not include the question of the ability to teach multiple subjects, and that's one of the main reasons proffered by Ms. Evans for selecting the winning candidate over the plaintiff. Can you address that specifically? Absolutely. So let me start with a couple of the facts. You understand the nature of the position, the temporary funding, the fact that the job's likely to go away. Here's another fact that bears directly upon that that is not emphasized in the record below, but that I think in hindsight is extremely important and directly addresses what you just raised. And it's this. Number one, I can't point you to the spot in the record as I stand here, but it was not Principal Evans that crafted the questions. It was Nick Sutherland, one of the other members of the committee. That said, Ms. Evans, a week before these interviews, sends an e-mail to Nick Sutherland, and to be fair with the record, the e-mail, which was part of the record below, did not make the trip from Spokane to here, but we argue it in our brief, and it's referred to at least two other times in the record at Excerpts 294 and 309, which are my declaration and a statement of material facts. You're talking about the e-mail that requests scheduling interview with the candidates who have engineering backgrounds. Absolutely. That's exactly, Your Honor. And so a week before these interviews, she says to Nick Sutherland, it looks like we have a couple applicants who have an engineering background and can teach another subject. The reason that's huge is because it completely torpedoes the plaintiff's argument that this is a post hoc creation or a pretextual afterthought. Instead, it was something that Jamie Evans was focused on before the interviews. It was the reason that she provided to the superintendent when asked about this. What does this mean? The e-mail says, I asked Stephanie to schedule all seven applicants because two of them have engineer backgrounds and we may be able to offer them a pre-engineering CTE part-time position? Is that a reference to teaching multiple subjects? Yes, classroom time equivalent. She could fill in. We can use her in other areas is the long and short of it. And, of course, there were seven applicants originally. There were four that ended up being scheduled for interviews. One dropped out at the last minute and they only interviewed three. Of those, Ms. Azeem was the only one who appeared and had the engineering background and would have been able, as Evans said on multiple occasions, to teach multiple classes. So let's assume for the moment that the learned judge below is correct, that the mere answer to a question by Ms. Evans that, when asked, says, yes, she may have been non-Caucasian. That's as far as she goes in addressing the, but Judge Rice finds, okay, that meets the presumption test. K-12 comes back with, but we had this very clear common sense reason for hiring one applicant over the other. That's a business-based decision. So let me take that head on. As you point out, the other applicant had an engineering background, could teach multiple subjects, and it was for a job that's likely to sunset and the funding expire. That's a killer fact, a case wrecker, if you will, in this circumstance, because it's unrebutted, it's undeniable, and it's exactly how the facts played out. The funding compels the jury to believe it. My concern here is this is summary judgment. Agreed, Your Honor. And if we got a jury verdict, I mean, the standard is the same as if we got a jury verdict and the court sets it aside because a reasonable jury couldn't reach that conclusion. Why couldn't the jury decide, yeah, that was the reason, but it wasn't the real reason? It was just floating out there, and maybe it violated the collective bargaining agreement anyway. So we don't believe that. And what prohibits a jury from deciding I don't believe that that was really the reason? Well, as you know, of course, on summary judgment, number one, we're required to merely articulate a nondiscriminatory reason for the hire. But that doesn't end the case. It doesn't. And I don't think the argument, the serious argument here is a question of whether the employer offered up a justification. The question is, going back to the underlying issue, the jury didn't or did the jury have to believe that was not only the justification offered and it had a legitimate basis, but that was really what motivated the result, as opposed to plaintiff's argument that it was really this desire for diversity that motivated the result. And why couldn't a jury, I mean, I may not be, I may not think plaintiff's case is very persuasive, but that's not the standard. And that Judge Rice didn't think the case was very persuasive isn't the standard either. The question is, could a jury have reached that conclusion, and did that decision have been unreasonable? So, frankly, I think you're flipping the burden on me, Your Honor. No. Because this is summary judgment. The burden is on you. You've got to establish that a reasonable jury couldn't reach that conclusion. And let me go ahead and introduce the other subject, which actually gives me somewhat greater concern, which is the district court distinguished between race and religion and national origin. I've had a lot of employment discrimination cases, and I can't remember one where, in the more typical format, the minority, the African-American, in this case, the woman who appeared to be a Muslim from Middle Eastern descent, actually was expected to offer affirmative evidence of race, religion, national origin, and that the employer thought that. Ordinarily, if a black man walks into an interview, everybody understands the employer recognizes that this person is black. But in this case, apparently the failure to put forth affirmative evidence was taken by the judge as a basis for saying, well, there's not a prima facie case that she was of a different religion, or more to the point, that the committee, the hiring committee, the employer didn't infer that she was of a different religion, when, in fact, we know that one member of the committee did infer that fact, and nobody has ever argued that the inference was factually incorrect. So how is it that a jury couldn't reasonably conclude that, in fact, there was a distinction between the successful applicant and the plaintiff, and the distinction was that they had different not just race, but religion and national origin? Well, you gave me a lot to respond to there, so let me see if I can break it down. So going back to the standard, we have to raise a nondiscriminatory reason, then the burden shifts back to the plaintiff to say you're on summary judgment. So, yes, the plaintiff bears the burden of persuasion, but you have to establish that a jury couldn't have been persuaded. I have to establish that a jury could reasonably believe that the reason that we stated or could not reasonably believe. You have to establish that a jury couldn't reasonably have reached a different conclusion. Not that the jury could decide you win, but if the jury decided you did not win, that decision would have been unreasonable. That's the standard on summary judgment. The bulk of the evidence here supports the fact, and so I think it would be patently unreasonable for a jury to decide that there was a true reason other than the one that Jamie Evans gave when it was something she was focused on ahead of time, that's something she discussed with others, that she ultimately said was the reason that she chose and that she said consistently throughout. So let me come back. But you go back to the factual record that the district court relied on, which is at the time that Ms. Evans reached out to the references, she got mixed reviews, and Ms. Evans noted that. She did. So isn't there some contemporaneous record of Ms. Evans' thoughts as to the mixed references that played into the decision-making process? There is, and those are other facts that weigh in our favor in this case, Your Honor, that there was negative information that was provided about the applicant that was not selected. At the end of the day, I don't think those played a big role because it appears to me, fairly undeniable, that Ms. Evans was focused on one thing when she went into this interview, and that was to hire a person that she might be able to keep on at the end of this program. Were there other bases for that decision as well? Yes, there could have been. Those helped support what she appeared to be focused on at the time that she did the interview. In fact, I'll go so far as to say, Your Honor, that she may have had her mind made up before these interviews took place, and it might have even seemed unfair to Ms. Fergus that she came in and she didn't get asked. Of course, it doesn't make any sense to ask her about can she teach another job because they have her resume. She's worked for WAVA before. She's been turned down by OMAC before. Those things are on the record that are known quantities about the other applicant. I know you wanted to yield some time. It's very hard to share time. I do need to yield. So let me say just this in finishing, and I'm sorry, Judge Clifton, I didn't get to all of the issues that you raised, but I think the bulk of the facts here would bring a reasonable trier of fact to our position and make it very, very hard. Do you think it would be unreasonable for a jury to conclude that plaintiff and the successful applicant were of different races, religions, and national origins? Because based on Judge Nguyen's earlier questions, whether Mark Conley is willing to engage in rank speculation about what type of religious headdress, if it was a religious headscarf, do you have any authority, any citation that suggests the failure to offer affirmative evidence of that fact? Of which fact, Your Honor? Just so I'm clear. Of the different race, religion, or national origin, when people have met each other, conducted an interview, I mean, nobody, I hope today, ever asks those questions. What religion are you? What race are you? But everybody draws inferences. And I really have trouble understanding how it is it would be unreasonable for a jury to say that this committee didn't figure out that the successful applicant was of Middle Eastern origin. Can I answer that question without cutting into my colleague's time? Why don't you go ahead and finish your answer. Okay. Number one, their skin tone was arguably different, but not that much. I saw the picture. I couldn't tell. And I'm not casting aspersions on Your Honor, but I would not have made an assumption about her race. But that's not the question. The question is, could the jury have concluded that people might have been able to tell? And Mr. O'Connolly plainly did. Religion? No. Could she have been of Middle Eastern descent and been a Coptic, Palestinian, or other Christian? Absolutely. So if the point is you're working hard not to answer my question. Well, I'm not. I'm not saying would it be reasonable for someone to infer a different result. My question, which I've said several times, is it would have been unreasonable for the jury to look and draw the same conclusion that Mr. O'Connolly drew. I think a jury, a trier of fact, could have looked at these two people and concluded that there may be differences but didn't have enough information on which to draw a legal conclusion. So it would have been unreasonable for them to conclude there were differences. If you don't answer that question yes, then you're giving this point up. Well, I think that's why Judge Rice found the presumption, because he found there was just enough to assume that there was some difference. Only for race, not for religion, not for national origin, a distinction which baffles me. Well, I'm sorry, Your Honor. I can't go with you on religion because there's too many religions outside the United States that could have worn religious headscarves. So you can say that Mr. O'Connolly was unreasonable in drawing the inference he did. I think he was. And is there any evidence in the record that his inference was wrong? No. Can I add one more thing? I quizzed myself when I got this case. I went to the Internet and I looked up a bunch of pictures of women wearing religious headscarves. I was wrong more often than I was right when I made assumptions about what religion they belonged to. If we let the plaintiff make those same wrong assumptions, I think we'd miss the boat. I'll concede the rest to Mr. Baker, and thank you for your indulgence. You're actually over time, but let me put a couple of minutes on the clock. Thank you very much, and I'm sorry, Mr. Baker. Thank you. May it please the Court, my name is James Baker, representing the Olmec School District. We're in a little bit different position than K-12. Our school district is in eastern Washington up in the Okanagan, and the K-12 is an organization in the Puget Sound. And K-12, to do their online schools, they're required to hook on with some school district. And they were with a different school district before, and then they hooked on with Olmec School District. So Olmec School District was not involved whatsoever, any way whatsoever, with the interviews, and knew nothing about her race, color, religion, national origin, knew nothing. So the only way, I think, that the Olmec School District can have any kind of liability is through some sort of agency principle, and that gets into the cat's paw. And under the Ninth Circus case in Poland and the Staub case by the United States Supreme Court, we're talking about a biased subordinate. And Jamie Evans was never a subordinate or an employee or an agent of the Olmec School District. Thank you very much. Thank you. How is she not an agent? I guess I'm confused by that. How was it that K-12 was not acting as an agent for the school district if it was going through the process of identifying who it wanted as a successful candidate and propose it to the school district? Well, they were making a recommendation to the Olmec School District, but they weren't, it wasn't in the scope of any employment with Olmec School District. I mean, if... Oh, but for the relationship with the school district, they wouldn't be doing any hiring at all. Wouldn't conduct interviews, wouldn't solicit applications. It's only because they have this relationship that they're going through that process. Well, I think you have to put the tort principles involved. Let's say that Jamie Evans spilled hot coffee all over a plaintiff during the interview. Olmec School District wouldn't be liable for that. We're talking about intentional discrimination, things motivated by it. Actually, the Poland case and the Staub case really don't talk in terms of agency. They talk in terms of subordinates or persons who are actually in the scope of employment or non-decision makers in the same organization. Thank you. Any other questions? Thank you. I think we've got the argument. Thank you. Your Honor, I'd like to focus just on a couple of key points. First, declarations that only white or white-looking employees were laid off was sufficient evidence to make the prima facie case in Aragon v. Republic Silver. White or white-looking. I believe our position has a place in precedent, and they, not I, are taking the novel position. A minute ago, I told you what the record said with regard to Ms. Hirschman's view on diversity. The district court substituted the evidence and gave a definition of diversity. You've heard from Ms. Hirschman. How about Ms. Evans, the decision maker? She said, what do you think she, meaning Ms. Hirschman, was talking about when she said diversity? Answer, I don't recall what I believed when the word was mentioned. So the district court substituted the evidence for a theory that fit the rest of the opinion. Diversity is important. Using the word diversity in the employment process doesn't lead to automatic liability. It's just a fact. The topic of the e-mail that counsel referenced indicating that Ms. Evans, from the start, even before the interviews, really focused on individuals with engineering degrees because it created flexibility in terms of what they're able to teach. It's a competing inference that loses on summary judgment. If it was important, Ms. Evans had the power to put that in a question. If it was important, Ms. Evans could have asked Ms. Fergus. Ms. Evans made the decision without asking Ms. Fergus whether or not she could teach another class. All right. Thank you very much, counsel, for both sides for your arguments. The matter is submitted for decision by this court. And that was our last case for the argument calendar today. We're in recess until tomorrow.
judges: Fernandez, Clifton, Nguyen